**MANUFACTURED HOUSING INSTI-
TUTE, et al., Appellants,**

v.

**George R. PETTERSEN, Individually, et
al., Respondents.**

No. C7–83–124.

Supreme Court of Minnesota.

March 23, 1984.

Stephen H. Cohen, Minneapolis, for appellants; Edward F. Canfield, John Gerstein, Washington, D.C., of counsel.

Hubert H. Humphrey, III, Atty. Gen., Paul G. Zerby, John Breviu, Audrey Kaiser Manka, Sp. Asst. Attys. Gen., Minneapolis, for respondents.

SIMONETT, Justice.

Appellants contend that a Minnesota Health Department rule setting a maximum indoor air level of formaldehyde in newly constructed housing units is invalid. They claim that the Commissioner of Health exceeded his authority in promulgating the rule, and that the rule is unconstitutional. They further claim the district court erred in restricting its review solely to the record in the administrative rulemaking proceeding. We hold that judicial re-

view is on the record, but we also find that the maximum ambient level set by the rule is an arbitrary and capricious determination; consequently, we reverse and remand to the agency for reconsideration.

On June 28, 1982, the Minnesota Department of Health promulgated Rule 448 entitled "Formaldehyde in housing units." 39C Minn.Code Agency R. § 1.448 (1982). The rule provides that newly constructed housing units containing more than 0.5 parts of formaldehyde per million parts of air (ppm) at the time the housing unit is to be sold, as measured by testing procedures set out in the rule, may not be sold in this state.

Plaintiff-appellant Manufactured Housing Institute is an incorporated association of mobile home manufacturers. The other plaintiff-appellants either make or sell mobile homes. The plaintiffs bring this declaratory judgment action against the Commissioner of Health, the Department, and the State, challenging the validity of the rule. On December 23, 1982, the district court granted defendants' motion for summary judgment, ruling as a matter of law that the rule was valid. This appeal followed.

## I.

The first question is procedural. Is district court review of the pre-enforcement, rulemaking process made on the basis of the record of the agency proceeding, as the state contends? Or is there a trial de novo in the district court, as appellants contend? The trial court ruled that review is on the agency record only. We agree with the trial court.

This action is a pre-enforcement challenge, *i.e.*, it questions the process by which the rule was made and the rule's general validity before it is enforced against any particular party. This is to be distinguished from an action wherein the rule is sought to be enforced against a particular party and, in that contested setting, the validity of the rule as applied to a particular party is adjudicated.

In a contested case, Minn.Stat. § 14.68 (1982) says that judicial review "shall be confined to the record, except in cases of alleged irregularities in procedure, not shown on the record * * *." But where, as here, there is a pre-enforcement challenge, judicial review is governed by Minn. Stat. §§ 14.44 and 14.45 (1982). Section 14.44 provides that "[t]he validity of any rule may be determined upon the petition for a declaratory judgment thereon * * *." Section 14.45 defines the scope of judicial review, stating that "[i]n proceedings under section 14.44 the court shall declare the rule invalid if it finds that it violates constitutional provisions or exceeds the statutory authority of the agency or was adopted without compliance with statutory rulemaking procedures."

As appellants point out, neither section 14.44 nor 14.45 mentions restricting judicial review to the agency record in a pre-enforcement challenge. Furthermore, the use of a declaratory judgment action, which traditionally is an independent court action, suggests judicial review is to be on a new record made in district court with the traditional evidence-receiving and fact-finding functions of the district court employed. Appellants further argue that in a rulemaking hearing, as opposed to a contested lawsuit, the testimony is not under oath and there is no right to cross-examination, to discovery, or to a hearing examiner learned in the law; the agency record thus lacks many of the safeguards that might otherwise entitle it to judicial deference. In *Can Manufacturers Institute, Inc. v. State*, 289 N.W.2d 416 (Minn.1979), appellants note, the district court conducted a trial and considered additional evidence in a declaratory judgment action challenging a statute and its administrative regulatory scheme as unduly burdensome on interstate commerce. Appellants also cite *Kassel v. Consolidated Freightways Corp. of Delaware*, 450 U.S. 662, 101 S.Ct. 1309, 67 L.Ed.2d 580 (1981), and *Raymond Motor Transportation, Inc. v. Rice*, 434 U.S. 429, 98 S.Ct. 787, 54 L.Ed.2d 664 (1978), as instances of a trial court making its own

record on challenges to the constitutionality of statutes and administrative rules.

Respondents counter that Minnesota's long and involved rulemaking procedures were designed specifically for the development of a complete hearing record, with little or no restriction on the evidence admissible from any interested party. Minn. Stat. §§ 14.13–.38 (1982). Here, plaintiff-appellants participated vigorously in the rulemaking proceeding; and the administrative record supports respondents' claim that appellants had, and took, full opportunity to dispute the state's evidence and to advance their own position with witness testimony and a wide range of documentary evidence submitted both before and at the public hearing.

While the statutes are silent on the record to be used for a pre-enforcement rulemaking challenge in the courts, we agree with the trial court that public policy and legislative intent call for restricting judicial review to the record made in the agency proceeding. After the long, even laborious, gathering of evidence in the administrative proceeding there is no need to plow the same ground again in a trial in district court, with the attendant delay and expense. If the administrative hearing is only preliminary to a district court trial, a challenger to the rule might use the administrative hearing as a discovery device, saving its evidence for the district court trial, thus emasculating the rulemaking process at the administrative level. Moreover, the elaborate rulemaking procedure established by the legislature, together with the limitation of judicial review to just three stated legal issues, suggests that the legislature intended judicial review under sections 14.44 and 14.45 to be confined to the record.

In *Minnesota-Dakotas Retail Hardware Ass'n v. State*, 279 N.W.2d 360 (Minn.1979), we contrasted judicial review in a contested, enforcement proceeding with a pre-enforcement rule challenge. In a pre-enforcement challenge, we said that any "[b]road and far-reaching scrutiny of a rule or regulation, based upon hypothetical facts, is a premature exercise by the judiciary"; and we then concluded, "[c]onsequently, the standard of review is necessarily more restricted." *Id.* at 363. For example, in a pre-enforcement constitutional challenge, the challenge is to the constitutionality of the rule on its face; in a contested enforcement action, the challenge is more to the constitutionality of the rule as applied. Judicial review of an agency adjudication, as we have seen, is limited to the administrative record; here, in a pre-enforcement action, where judicial review is even more restricted, we think review on the record should likewise suffice.

We hold, therefore, that judicial review by the district court in a pre-enforcement challenge of a rule's validity pursuant to Minn.Stat. §§ 14.44 and 14.45 is on the record made in the rulemaking proceeding.[1]

## II.

Appellants next challenge the rule on the ground that it "exceeds the statutory authority of the agency." Section 14.45. The pertinent statute is Minn.Stat. § 144.495 (1982), which reads:

Within 30 days after April 24, 1980 the commissioner of health shall determine *if a significant health problem is presented* by the use of building materials that emit formaldehyde gases. If he determines that such a problem exists he shall promulgate rules pursuant to chapter 14,

---

1. Appellants also assert a procedural irregularity. They claim that the Department of Health during the administrative hearing disclaimed reliance on certain studies, thus "foreclosing" appellants from rebutting those studies; but then, after the declaratory judgment action was brought, that the Department made a "complete turnabout" and relied on the originally disclaimed data. Appellants contend they should now be given an opportunity to at least supplement the record in district court. A review of the record below received by this court shows appellants' assertion is without merit. Appellants were not foreclosed and the Department did not make a turnabout. Conceivably, instances might arise where an irregularity might, in fairness, require supplementation or clarification of the rulemaking record, but this is not such a case.

including emergency rules, establishing standards *governing the sale* of building materials and housing units that contain products made with urea formaldehyde. (Emphasis added.) Appellants argue, first of all, that the commissioner failed to make a sufficient or proper threshold finding of a "significant health problem" before initiating the rulemaking process; second, that the legislature authorized no more than a rule requiring written warnings on the product at time of sale but that the agency's rule constitutes an outright ban on sales of housing units that do not meet the standard; and, third, that the rule is, in effect, not a health standard which the Department of Health might adopt, but a standard governing construction of mobile homes, which is governed by Minn.Stat. §§ 327.31–.36 (1982), the mobile home building code. Finally, appellants argue that the purported statutory authority is an unconstitutional delegation of legislative power.

■ 1. It is perhaps unfortunate that the Commissioner of Health, in making his determination that formaldehyde in building materials posed a "significant health problem," as required by the enabling act, chose to do so in the form of a "press release." Nevertheless, regardless of this informality, the determination was duly made. The Commissioner's statement explained the basis for that determination, citing complaints of eye and skin irritations, breathing difficulties, nosebleed, and nausea caused by formaldehyde vapors inside newly constructed dwelling units, noting that Wisconsin and Massachusetts had taken action, and advising that the Commissioner would soon propose a rule establishing a 0.5 ppm maximum formaldehyde level in new housing units. Appellants complain the determination made no attempt to distinguish a significant from an insignificant health hazard, but we think this was hardly necessary. We hold that the Commissioner's threshold determination was adequate to trigger initiation of the rulemaking process. Further study of the problem could take place, as it did, in the rulemaking proceedings.

■ 2. Appellants argue that the legislative history surrounding the enabling act, section 144.495, indicates a legislative intent to delegate only the authority to issue standards or guidelines for housing units, not authority to ban all sales of units with ambient formaldehyde levels in excess of a certain level. Thus, in companion legislation appearing at Minn.Stat. § 325F.18 (1982), the legislature rejected the notion of banning any sales in favor of a statute merely requiring written warnings for all homes sold with formaldehyde-containing components. Respondents, on the other hand, cite legislative history suggesting deliberate legislative referral to the Health Department experts to set a formaldehyde ceiling. The enabling statute is perhaps subject to different interpretations. But considering the weight to be given an agency's interpretation of a statute it is charged with administering, *Krumm v. R.A. Nadeau Co.*, 276 N.W.2d 641 (Minn.1979), and in view of the well-established principle that the power to regulate includes the power to restrict or prohibit, *United States v. Darby*, 312 U.S. 100, 113, 61 S.Ct. 451, 456, 85 L.Ed. 609 (1941), it is more reasonable to interpret section 144.495 to authorize the setting of a maximum permissible ambient level for formaldehyde in new homes. We so hold.

3. The argument that the rule is really a construction standard is without merit and unworthy of discussion, since the formaldehyde rule is clearly health-related and addresses the issue of ambient formaldehyde levels.

■ 4. Finally, we hold that the enabling act is not an unconstitutional delegation of legislative power to the agency. In one sense, section 144.495 comes close to simply telling the Commissioner of Health to see if there is a problem and, if so, to make a rule to do something about it; but a fairer reading shows that the Commissioner is to determine whether a *significant* health problem is presented by building materials emitting formaldehyde gases and, if so, to promulgate *reasonable* stan-

dards governing the sale of such materials. *See Lee v. Delmont*, 228 Minn. 101, 114, 36 N.W.2d 530, 539 (1949) (enabling acts are to be interpreted so as to authorize only reasonable regulations). In construing this delegation, we are mindful that "[t]he modern tendency is to be more liberal in permitting grants of discretion to administrative officers in order to facilitate the administration of laws as the complexity of economic and governmental conditions increase." *Anderson v. Commissioner of Highways*, 267 Minn. 308, 311–12, 126 N.W.2d 778, 780–81 (1964).

### III.

■ Appellants next assert that the rule is arbitrary, unreasonable, vague, and not supported by substantial evidence. They claim that the rule therefore violates their constitutional right to substantive due process and, also, that it unduly burdens interstate commerce. In attacking a statute or regulation on due process grounds, one bears a heavy burden; the statute or rule need only bear some rational relation to the accomplishment of a legitimate public purpose to be sustainable. *Williamson v. Lee Optical of Oklahoma, Inc.*, 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563 (1955); *Contos v. Herbst*, 278 N.W.2d 732, 741 (Minn.), *appeal dismissed sub nom., Prest v. Herbst*, 444 U.S. 804, 100 S.Ct. 24, 62 L.Ed.2d 17 (1979). Nevertheless, the issue is troublesome here, because the rationality of the rule appears to be lacking.

1. Formaldehyde appears as a bonding agent in building materials, such as plywood and particle board, which are commonly used in manufacturing mobile homes. These materials emit formaldehyde gas. This "off-gassing"—which is more rapid in higher temperatures and humidity—occurs at a faster rate when the particle board or plywood is new and decreases over time. Formaldehyde has been used, apparently without much incident, for many years in building materials, but more

so since the mid-seventies, when, to complicate matters, homes, especially mobile homes, began to be built more tightly to conserve energy. The result, apparently, has been that ventilation in the homes is insufficient to dissipate the "off-gassing." People in the homes complain of various health problems or irritations, attributing their problems to the formaldehyde vapors. On the other hand, it is not always clear if the health complaints might not be related to other factors, such as allergies, undiscovered toxicants, or even to particular ailments of the housing residents. It is possible, as well, that formaldehyde, if indeed the culprit, emanates from sources other than the building materials, such as carpets, household furnishings, cooking exhausts, and cigarette smoke. Furthermore, people differ greatly in their susceptibility and reaction to the presence of formaldehyde in the air. It is in this context that the Commissioner of Health attempted the difficult task of devising a rule for the maximum level of ambient formaldehyde that should be permitted in new housing units and a reasonable means of testing for that maximum level.

The difficulty is illustrated by what happened in the rulemaking process. The Commissioner initially proposed a rule with a maximum level of 0.4 ppm. The Hearing Examiner, after extensive proceedings, rejected this figure as unreasonable and substituted a maximum level of 0.8 ppm. The Chief Hearing Examiner reviewed the proposed decision, agreed 0.4 ppm was unreasonable, but then recommended a maximum level of 0.5 ppm "or higher." The Commissioner, after reviewing the findings and conclusions of both the Hearing Examiner and the Chief Hearing Examiner, determined that the rule should set the maximum level of 0.5 ppm.

Various field surveys and experimental studies on formaldehyde have been conducted, but all are seemingly either suspect or inconclusive.[2] Thus, the Hearing Exam-

---

**2.** The Department relied heavily on a March 1980 report of the National Academy of Sciences, which in turn relied largely on three

human experimental formaldehyde studies, *viz.*, the 1966 Schuck study of eye-blinking when exposed to artificial smog; the Weber-Tschopp

iner noted that the Commissioner's proposed 0.4 ppm level "is like picking a number out of a hat," although he also stated that some level of regulation was warranted.

Respondents concede that the data is imperfect and also that the Department may not adopt an arbitrary rule. Nevertheless, they contend—and we agree—that in fulfilling their obligation to protect the public health, it may be necessary, as here, to make judgments and draw conclusions from "suspected, but not completely substantiated, relationships between facts, from trends among facts, from theoretical projections from imperfect data, from probative preliminary data not yet certifiable as 'fact,' and the like." *Ethyl Corp. v. EPA*, 541 F.2d 1, 28 (D.C.Cir.), *cert. denied*, 426 U.S. 941, 96 S.Ct. 2662, 49 L.Ed.2d 394 (1976). *See also Amoco Oil Co. v. EPA*, 501 F.2d 722, 739–41 (D.C.Cir. 1974). We also agree that deference is to be shown to agency expertise, "restricting judicial functions to a narrow area of responsibility, lest [the court] substitute its judgment for that of the agency." *Reserve Mining Co. v. Herbst*, 256 N.W.2d 808, 825 (Minn.1977).

2. In any event, appellants claim that the Department must sustain its rule by "substantial evidence." We think not. One of the grounds for judicial review of an agency decision in an adjudicated case, it is true, is whether it is supported by "substantial evidence," *see* section 14.-69(e); however, no similar grounds appear for review in a pre-enforcement rule proceeding. *See* section 14.45. It appears, therefore, that the legislature intended the traditional "arbitrary and capricious" test, rather than the more rigorous "substantial evidence" test, to apply in rulemaking proceedings.[3] We so hold. Nevertheless, in determining if the agency acted arbitrarily and capriciously the court must make a "searching and careful" inquiry of the record to ensure that the agency action has a rational basis. *See Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.*, 419 U.S. 281, 285, 95 S.Ct. 438, 441, 42 L.Ed.2d 447 (1974); and *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971). Further, the agency must explain on what evidence it is relying and how that evidence connects rationally with the agency's choice of action to be taken. *Bowman Transportation, Inc.*, 419 U.S. at 285, 95 S.Ct. at 441; *Reserve Mining Co.*, 256 N.W.2d at 825.[4]

study of irritant effects of cigarette smoke; and the Ib Andersen study on formaldehyde which was an imperfectly controlled experiment involving 18 students with inconclusive results. The Ib Andersen study characterized the findings of the Schuck study as "hardly probable."

In Finding of Fact 13, paragraph F, the Hearing Examiner quoted a 1980 report of the National Academy of Sciences' Committee on Toxicology:

"The preliminary results of an ongoing carcinogenicity study in rodents, the uncertainty about the variability of responses to formaldehyde in normal populations and hypersensitive groups, and the current inadequacy of data (which leaves unresolved the no-observed-effect dose in humans) all point to the advisability of maintaining formaldehyde at the *lowest practical concentration* to minimize adverse effects on public health." [Emphasis added by Examiner.]

3. For a discussion of the two tests, *see AFL–CIO v. Marshall*, 617 F.2d 636, 649–50 (D.C.Cir.1979). *See also* K. Davis, *Administrative Law Treatise* §§ 29.00–29.01–8 (Supp.1976). Actually, the

two tests, in any event, would tend to merge in a rulemaking proceeding such as the one here. *See* K. Davis, *Administrative Law Treatise* § 29.-01–3 (Supp.1976). Recently, in *Minnesota Power & Light Co. v. Minnesota Public Utilities Comm.*, 342 N.W.2d 324 (Minn.1983), this court discussed the "substantial evidence" standard. We said it was not directed solely at the quantity of evidence but also at "requiring an agency to explain its methodology or reasoning when support for its conclusions is not readily discernible on the evidentiary record, as when the agency must make a judgment call." *Id.* at 329.

4. This requirement that the agency explain its determination is not some idle exercise in judicial officiousness. The purpose of "articulated standards and reflective findings" is to ensure "furtherance of even-handed application of law, rather than impermissible whim, improper influence, or misplaced zeal." *Reserve Mining Co. v. Herbst*, 256 N.W.2d 808, 825 (1977), *quoting Greater Boston Television Corp. v. F.C.C.*, 444 F.2d 841, 852 (D.C.Cir.1970), *cert. denied*, 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701 (1971).

3. Here the Commissioner concluded that a 0.5 ppm level is within "industry achievability." He cited credible supporting evidence in the record and explained his reasoning. The Commissioner also concluded, with evidentiary support, that the testing procedures for the presence of ambient formaldehyde were reasonable. Both of these conclusions were applications of agency expertise, articulated in a reasoned manner and based on evidence in the record; neither can be labeled arbitrary or capricious.

4. Most troublesome, however, is the Commissioner's conclusion that 0.5 ppm is a reasonable level to protect the health of persons living in housing units. In his Finding of Fact No. 29, paragraph C, the Hearing Examiner finds that a level of 0.8 ppm is reasonable for new housing. He gives his reasons for that finding, citing evidence that at that level, "most persons become aware of the presence of formaldehyde, either by odor or by some type of irritational response." The Hearing Examiner concedes that 0.8 ppm will not protect the hypersensitive "but neither would a .4 ppm or perhaps even a .1 ppm level." He observes that a 0.8 maximum level will be short-lived in new homes as emissions diminish, and notes that the level can be amended upward or downward, depending on further studies being done. In the same paragraph C, the Hearing Examiner sums up the highly unsatisfactory state of the evidence as to any level.[5]

The Commissioner of Health, in his decision, adopted "as my own" the findings of the Hearing Examiner as modified by the Chief Hearing Examiner, "except as noted." As to the critical Finding 29, paragraph C, the Commissioner stated he was rejecting that finding but only "to the extent that it recommends setting the level of 0.8" and "regarding the degree of testing required to avoid liability." The Commissioner then, without explanation, adopted the recommendation of the Chief Hearing Examiner to set the level at 0.5 ppm. It is difficult, it seems to us, not to characterize this unexplained selection of 0.5 as arbitrary. Simply saying that a particular level is reasonable does not make it so, especially where the Commissioner otherwise apparently adopts the factual findings of paragraph C of the Hearing Examiner's findings, set out in footnote 4 here, which stress the disparity of the various study results. Arguably, the Commissioner selected 0.5 ppm because the Chief Hearing Examiner selected it. But the Chief Hearing Examiner failed, as well, to give any reason in his findings and conclusions as to why he rejected 0.8 ppm and chose instead 0.5 ppm. The Chief Hearing Examiner's report seems to indicate that he chose 0.5 ppm as the lowest reasonable level because the record contains cost data for manufacturing or retrofitting mobile homes with that ambient level. But after noting that it might cost as much as $3,000, excluding testing costs, for a mobile home to meet the 0.5 ppm standard, the Chief Hearing Examiner poses the question: "Is this cost

5. Finding of Fact No. 29, paragraph C, reads in part:

There is nothing in the record, however, to justify the selection of a .4 ppm standard rather than .1, .3, or .6 other than the fact that the lesser concentration that exists, the less chance there is that any effects may be felt. Even that assumption is questionable, however, based upon the wide disparity of study results. No threshold limit value has been found for formaldehyde and the health effects it is supposed to produce. Industry compliance at this level would result in a substantial cost to the consuming public, most of whom would not need this degree of protection.

None of the human exposure studies relied upon by the Health Department show a causal relationship, or a dose-response effect for formaldehyde concentrations. * * *

What is very disconcerting is the small segment of persons who claim to be severely affected by very low levels of formaldehyde. There is sufficient evidence in the record to convince the Examiner that there is a hypersensitive population who will react acutely to much less than the .4 ppm. level proposed. For these persons, extra precautions will have to be taken * * *.

Because the studies yield such varied results and none can pinpoint what minimum level of formaldehyde exposure is detrimental to a person's health, or even will result in irritational awareness, the proposed level of .4 ppm is like picking a number out of a hat. * * *

of $3,000 per housing unit excessive when weighed against the benefits achieved in human health?" He then leaves the question unanswered.

5. We hold, therefore, that the Commissioner of Health's determination, as articulated by him, that a maximum ambient formaldehyde level of 0.5 ppm in new housing units is reasonably necessary to protect public health, is arbitrary and capricious and violates substantive due process. In so holding, we do not substitute our judgment for that of the Department of Health. We do not purport to evaluate the merits of the conflicting scientific evidence nor to supply our own "legislative facts" to arrive at an appropriate public health policy. We say only that having made a "careful and close" scrutiny of the Commissioner's action, we find that there is no explanation of how the conflicts and ambiguities in the evidence are resolved, no explanation of any assumptions made or the suppositions underlying such assumptions, and no articulation of the policy judgments. In short, there has been no *reasoned* determination of why a level of 0.5 ppm was selected. *See Bowman Transportation, Inc.,* 419 U.S. at 285–86, 95 S.Ct. at 441–42. We do not say 0.5 ppm is wrong; we only say we cannot tell if it is within the bounds of what is right.

Accordingly, we reverse and remand to the Department of Health to reconsider that portion of its rule here found to be defective and invalid. The reconsideration can be made on the present administrative record,[6] and it can be limited to determining what maximum ambient formaldehyde level in new housing units is reasonably required to protect members of the public using the housing from a significant health problem.

6. Finally, appellants claim the rule is an unconstitutional burden on interstate commerce. They contend that the "non-existent or negligible" benefits of the rule are outweighed by the substantial costs and inconvenience of compliance by manufactured housing producers across the country. They do not contend that the rule imposes any greater burden on out-of-state than in-state manufacturers; rather, they simply question the balance of benefit vs. burden. There is no merit to this claim. Where a regulation is even-handed and promotes a legitimate state interest, reasonable burdens on interstate commerce will be tolerated. *Minnesota v. Clover Leaf Creamery Co.,* 449 U.S. 456, 101 S.Ct. 715, 66 L.Ed.2d 659 (1981); *Kassel v. Consolidated Freightways Corp. of Delaware,* 450 U.S. 662, 101 S.Ct. 1309, 67 L.Ed.2d 580 (1981). The rule does not impose an unreasonable burden on interstate commerce, and we hold the commerce clause is not violated.

## IV.

Plaintiff-appellants brought this declaratory judgment action pursuant to Minn.Stat. § 14.44 (1982). The trial court ruled—correctly, as we have held—that the case should be heard on the agency record. Defendant-respondents then moved for summary judgment, which was granted. Appellants now claim it was error to dispose of this case by summary judgment. We hold that while summary judgment is inappropriate in this context, the trial court's procedural handling of the case, as a practical matter, was proper.

Appellants argue that there were genuine disputes as to material facts and to say, as a matter of law, that there were no factual disputes in this case, even granting

---

**6.** The administrative record, one might add, leaves something to be desired. The transcript of testimony, which we have, is difficult at times to decipher because of misspellings and the failure of the transcript to identify, in various exchanges, who is talking or what particular exhibit is being talked about. The record also includes, so we are told, two boxes of material plus several loose pocket envelopes. Respon-

dents state these record documents are listed in a "catalog" which was submitted to the district court. We have the catalog list, but that is all. Apparently, the parties did not deem it necessary that the complete agency record be presented to this court. As it turns out, in view of the inadequacy of the Commissioner's findings made below, there has been no need for us to have the documentary exhibits.

the limited scope of review, mischaracterizes the record. We agree. But it would also be an idle exercise to send this case back for "trial" in district court when there is no further evidence outside the agency record to be introduced (a record, we might add, that already includes the elaborate findings and conclusions of three different officers—the Hearing Examiner, the Chief Hearing Examiner, and the Commissioner of Health). On the other hand, the district court's review and such findings as it might make are limited to the three statutory grounds for review, namely, whether the rule "violates constitutional provisions or exceeds the statutory authority of the agency or was adopted without compliance with statutory rulemaking procedures." Section 14.45. Often the claimed constitutional violation will be, as here, lack of substantive due process which brings into play the "arbitrary and capricious" standard. In this context and with judicial review confined to the record, the use of a summary judgment motion seems incongruous.

Recently we noted that the declaratory judgment action "has become, in many ways, 'an all-purpose writ.'" *See Honn v. City of Coon Rapids*, 313 N.W.2d 409, 416 n. 5 (Minn.1981), *citing* J. Moore, Moore's Federal Practice ¶ 57.05 (1979). We think the legislature intended the declaratory judgment action to be so used here. In other words, the "petition for a declaratory judgment" serves as a kind of writ to bring before the district court for review the administrative record in a pre-enforcement rulemaking proceeding. The district court can then promptly make its review of the record, aided by whatever briefs and oral argument of counsel there may be, and decide. In effect, this is what the trial court did here in its memorandum decision, so we have no hesitancy in affirming the trial court's procedural disposition of the case. We think, however, that there is no need for a summary judgment motion, which at best is superfluous and at worst distorts the standard of review by suggesting that the trial court is deciding as a matter of law on undisputed facts.

Affirmed in part, reversed in part, and remanded to the district court for return to the agency for reconsideration.