**In re the Marriage of Lois A. CLAY, Petitioner, Respondent,**

**v.**

**Robert J. CLAY, Appellant,**

**County of Blue Earth, Gerald Augustin, Respondents.**

**Nos. C1–86–1056, C3–86–1057.**

Court of Appeals of Minnesota.

Dec. 9, 1986.
Review Denied Feb. 17, 1987.

Patrick A. Lowther, Sleepy Eye, for appellant.

David J. Twa, Blue Earth Co. Atty., Paul T. Ostrow, Asst. Blue Earth Co. Atty., Mankato, for Lois A. Clay and Blue Earth County.

Terence M. Dempsey, New Ulm, for Gerald Augustin.

Heard, considered and decided by RANDALL, P.J., and FOLEY and HUSPENI, JJ.

## OPINION

HUSPENI, Judge.

In this consolidated appeal Robert J. Clay seeks (1) review of a trial court order which denied his post decree motion requesting vacation of the decree provision adjudicating paternity of a minor child T.C. and also denied his request for blood tests; and (2) review of summary judgment awarded by the trial court in favor of respondents Blue Earth County and Gerald Augustin and dismissal of proceedings against respondents Lois Ullrich and T.C. in Clay's independent action which sought to vacate the decree provision regarding T.C.'s paternity, declare the nonexistence of a father/son relationship between Clay and T.C., and declare a father/son relationship between Augustin and T.C. On appeal Clay alleges that the trial court erred in not vacating the paternity provision of the decree, that summary judgment was inappropriate because a genuine issue of material fact exists, that he is entitled to seek indemnity or contribution from Augustin, and that Minn.Stat. § 257.57 subd. 1(b) is unconstitutional. Respondent Augustin filed a notice of review and seeks reversal of the trial court's denial to him of attorney's fees under Minn.Stat. § 549.21. He also seeks such fees on appeal. We affirm and deny attorney's fees to Augustin on appeal.

## FACTS

Lois Ullrich and Robert Clay were married July 5, 1977. During the marriage, Ullrich gave birth to a child in July 1978 and to T.C. in July 1981.

The marriage was dissolved on December 30, 1982, pursuant to a marital termination agreement executed by the parties. Only Clay appeared at the final hearing, which proceeded as a default hearing pursuant to the stipulation. Ullrich was unrepresented at that time. Clay was represented by the same attorney who represents him in the present proceedings. Ullrich admittedly knew at the time of the dissolution that Clay was not T.C.'s father. There was also testimony that Clay himself knew before the dissolution that T.C. was not his natural son. Ullrich testified that she told Clay that he was not T.C.'s father. Although Clay now denies having known of his non-paternity for certain at the time of the dissolution, there is evidence in the record to the contrary. An October 12, 1982, letter from a custody investigator to the judge stated "[Clay] is alleging that their youngest child is not his." Also, Clay testified in a June 3, 1985, hearing that at the time the stipulation was signed, he had reason to believe he was not T.C.'s father. When asked the reason for his suspicions Clay replied "Well, [T.C.] looked just like Jerry Augustin." Further, when Clay's attorney asked why Clay took no affirmative action at the time of the dissolution to determine paternity of T.C., Clay replied "Well, for one thing, I couldn't afford it, but then I thought well, why should I be paying for a child that isn't mine?" Finally, in an exchange of documents in the early stages of this appeal on the issue of how extensive the transcript before this court should be, Clay's attorney, arguing for minimal transcript portions only, stated:

First, included in the transcript is the testimony of Lois [Ullrich] at the June 3, 1985 hearing that she told Robert about his nonparentage of [T.C.] before the divorce. Second, the February 18, 1986 order of Judge Litynski, which is included in appellant's appendix * * * refers to an October 12, 1982 letter of Rhonda Hanten indicating that Robert told her that he suspected [T.C.] was not his.

These two items of evidence, candidly disclosed by appellant in his brief, provide a sufficient basis for the appellate court to determine that Robert suspected and may have been aware at the time of dissolution that [T.C.] was not his issue. Respondent should not be permitted to shift to appellant the burden of its failure to comply with RCAP Rule 110.02 subd. 1, particularly as there is sufficient evidence before the court of appeals regarding the issue raised by respondent.

At the time of the dissolution the trial court found, pursuant to the stipulation between the parties and pursuant to Clay's default testimony, that T.C. was the issue of the marriage. The stipulation and decree provided that Clay was to pay $150 monthly child support to Blue Earth County. No appeal was taken from the decree.

In May 1984, pursuant to agreement between the parties, custody of the older minor child was transferred to Clay. He paid no child support after the custody transfer. In October 1985, Blue Earth County brought an action to recover unpaid child support. In March 1986, the trial court ordered appellant to pay back support for T.C. in the sum of $1,725 ($75 per month for 23 months).

Meanwhile, in April 1985, Clay moved the court to order a blood test in order to determine whether he was T.C.'s biological father, to terminate his child support obligation if he were found not to be the father, and to permit him to recover from the county the child support payments he had already made. Subsequently, the Blue Earth County Attorney moved to deny Clay's request and grant the county attorney's fees. In June 1985, Clay amended his motion and requested the additional relief of setting aside the portion of the judgment and decree determining T.C.'s paternity.

On June 18, 1985, the trial court denied Clay's motions for blood tests and vacation of that portion of the decree determining T.C. to be the child of Clay, indicated that a guardian ad litem was to be appointed for T.C. in any future proceedings and denied the county's request for attorney's fees.[1]

On December 23, 1985, Clay commenced his independent action seeking a judgment vacating the dissolution decree's provision on T.C.'s parentage, declaring the nonexistence of a father and son relationship between himself and T.C., declaring a father and son relationship between T.C. and respondent Augustin, discharging Clay from the liability for child support with respect to T.C., and awarding damages in the amount of all child support payments made by Clay with respect to T.C., as well as attorney's fees, costs and disbursements. Clay also moved for the appointment of a guardian ad litem for T.C. and for an order requiring Ullrich, Augustin and T.C. to submit to blood tests. In an order dated February 28, 1986, the trial court denied Clay's motions. It held that the issue of T.C.'s paternity was res judicata as to Clay, as it had been in issue at the dissolution proceeding and in Clay's motion for post-dissolution relief.

Prior to the trial court's February 28 order, Clay's attorney arranged for Clay, Ullrich and T.C. to submit to simultaneous blood tests.[2] The results of the blood tests indicated that "challenged father is NOT one of the biological parents of the child in question."

In March 1986, respondent Augustin, who had denied paternity of T.C. in his Answer to Clay's complaint, moved for summary judgment. The trial court granted that motion but denied Augustin's request for attorney's fees. In April 1986, Blue Earth County moved for summary judgment and for attorney's fees. In an order dated April 24, 1986, the court granted this motion and dismissed Blue Earth County as a party defendant in the action. Although Ullrich and T.C. did not move for

---

1. This order is reviewed on appeal because notice of filing was never served by either party. Therefore the 30 days appeal time has never commenced running. Minn.R.Civ.App.P. 104.-01.

2. We note that despite the order of June 18, 1985, denying Clay's request for blood tests, Ullrich voluntarily submitted to blood tests on herself and T.C. Ullrich has no independent counsel in this matter. In a letter dated April 7,

1986, to the trial court, respondent Blue Earth County indicated that in connection with Clay's independent action it "[did] not represent Ms. Ullrich." However, Blue Earth County opposes all relief requested by Clay, apparently on the basis of the county's financial interest in obtaining support monies to set off against Ullrich's AFDC grant. We must conclude that Ullrich's position is, in fact, not adverse to Clay's. It may, indeed, be adverse to Blue Earth County's.

summary judgment, the court also dismissed the action against them.

Pursuant to Minn.Stat. § 549.21 (1984), respondent Gerald Augustin, in a separate motion, moved for an award of attorney's fees on appeal in the amount of $1,186.00. This court deferred the decision on the motion for fees until consideration of the appeal on the merits.

## ISSUES

1. Did the trial court err by denying appellant's motion to vacate the paternity finding in the dissolution decree?

2. Did the trial court err by granting respondents summary judgment under Minn.Stat. § 257.57, subd. 1(b), and *Pierce v. Pierce*, 374 N.W.2d 450 (Minn.Ct.App.), *pet. for rev. denied*, (Nov. 14, 1985)? Is relief available to appellant under Minn.R. Civ.P. 60.02(6), and Minn.Stat. § 548.14?

3. Is appellant entitled to seek indemnity or contribution from respondent Gerald Augustin?

4. Is respondent Augustin entitled to attorney's fees under Minn.Stat. § 549.21?

## ANALYSIS

### I.

#### *Vacation of Decree*

T.C. was born while Clay was married to Ullrich. Under Minn.Stat. § 257.55 (1984), [a] man is presumed to be the natural father of a child if:

(a) He and the child's natural mother are or have been married to each other and the child is born during the marriage, or within 280 days after the marriage is terminated by death, annulment, declaration of invalidity, dissolution or divorce or after a decree of legal separation is entered by a court.

Where the issue of paternity has been decided in a dissolution decree and the parties have had an opportunity to be heard on the issue, the parties are collaterally and equitably estopped from challenging the adjudication. *See Markert v.*

*Behm*, 394 N.W.2d 239 (Minn.Ct.App.1986). In addition, we have held that a dissolution decree which determines paternity is res judicata with respect to that issue. *State ex rel. Ondracek v. Blohm*, 363 N.W.2d 113, 115 (Minn.Ct.App.1985). In *Ondracek*, this court held that the issue of paternity is required to be raised in every dissolution petition, *id.*, and that "the finding of fact that the children are the minor children of [a party] is res judicata and bars further litigation of the issue in the paternity action." *Id.* at 114. *See also State ex rel. Mart v. Mart*, 380 N.W.2d 604 (Minn.Ct. App.1986) (where paternity was raised in the complaint but waived in exchange for an agreement concerning custody and child support, appellant's defense of non-paternity was barred in a subsequent URESA action).

The trial court, in its decree dissolving the marriage, determined that T.C. was the issue of the marriage of Clay and Ullrich. They had stipulated to T.C.'s paternity. Only Clay appeared at the final hearing. Under oath he testified regarding the provisions of the stipulation. He had the opportunity both at the time of the stipulation and at the final dissolution hearing to assert a claim that he was not T.C.'s father. The dissolution decree was not appealed. Notwithstanding the assumption of the dissent to the contrary, it is clear from the record that Clay knew or should have known at the time of the dissolution that T.C. was not his child. The trial court properly found that Clay could not raise the issue of paternity in a post decree motion. The doctrine of res judicata prevented him from doing so. It follows that the trial court's denial of the request for blood tests was also proper.

### II.

#### *Independent Action*
##### A. *Summary Judgment*

On appeal from summary judgment, the function of the appellate court is to determine whether there are genuine issues of material fact and whether the trial

court erred in its application of the law. *Betlach v. Wayzata Condominium,* 281 N.W.2d 328, 330 (Minn.1979).

Clay alleges that at the very least, the blood test evidence he offered in his independent action presents a question of fact entitling him to a trial on the merits. He does not set out any disputed facts for purposes of summary judgment except that raised by the results of the blood test. However, respondents do not dispute the test results or their meaning. Consequently, the existence of these test results does not present a genuine issue of material fact. Although the test results may present this court with a thorny issue, we conclude that summary judgment was appropriate.

### B. *Appellant's Theories for Relief*

Clay raises essentially three arguments in support of the relief he seeks in his independent action, namely, that Minn.Stat. § 257.57, subd..1(b) (1984) is unconstitutional; that the trial court abused its discretion in not granting him the relief he seeks under Minn.R.Civ.P. 60.02(6); and that he should be permitted to prove fraud under Minn.Stat. § 548.14 (1984).

### 1. *Section 257.57, subd. 1(b)*

This statute provides that a child, its natural mother or a man presumed to be the child's father may bring an action

> for the purpose of declaring the nonexistence of the father and child relationship presumed under section 257.55, subdivision 1, clause (a), (b), or (c) only if the action is brought within a reasonable time after the person bringing the action has obtained knowledge of relevant facts, but in no event later than three years after the child's birth.

*Id.*

"The three-year statute of limitations is absolute in that it bars action *even if* the presumed father obtains knowledge of illegitimacy after the running of the statute." *Pierce v. Pierce,* 374 N.W.2d at 452. (Emphasis in original.)

Clay is presumed to be T.C.'s natural father under section 257.55 subd. 1(a). T.C., who was born on July 29, 1981, was almost four years old when Clay sought to vacate the finding of paternity. Clay concedes that the application of the time limitations set forth in Minn.Stat. § 257.57, subd. 1(b) would preclude relief.

However, he challenges the constitutionality of section 257.57 on the basis that the three year limitation period for commencement of an action to declare the nonexistence of a father-child relationship violates the due process clauses of the United States and Minnesota constitutions.

■ We note that before appellant can challenge the prima facie constitutionality of the statute, he must notify the Attorney General. Minn.R.Civ.App.P. 144.

> When the constitutionality of an act of the legislature is questioned in any appellate proceeding to which the state or an officer, agency or employee of the state is not a party, the party asserting the unconstitutionality of the act shall notify the attorney general within time to afford him an opportunity to intervene.

*Id. See also Markert,* 394 N.W.2d 239 (Minn.Ct.App.1986). Clay has failed to notify the Attorney General. Therefore, as we stated in *Markert,* we need not consider the prima facie constitutionality of the statute, but only the constitutionality of the statute as applied. *Id.*

■ Clay acknowledges that one attacking a statute on due process grounds must show that the statute does not bear any rational relation to the accomplishment of some legitimate public purpose. *Williamson v. Lee Optical of Oklahoma, Inc.,* 348 U.S. 483, 488, 75 S.Ct. 461, 464, 99 L.Ed. 563 (1955) (supreme court held that to withstand challenge on due process basis, "it is enough that there is an evil at hand for correction, and that it might be thought that the particular legislative measure was a rational way to correct it"); *Manufactured Housing Institute v. Petterson,* 347 N.W.2d 238, 243 (Minn.1984) (statute or rule being attacked on due process grounds "need only bear some rational relation to

accomplishment of a legitimate public purpose to be sustainable").

Minn.Stat. § 257.57 was designed to promote legitimacy. *Pierce,* 374 N.W.2d at 452. This is an appropriate public purpose. Clay contends, however, that application of the statute in this case defeats the very purpose for its enactment because true legitimacy for T.C. would be an adjudication of respondent Augustin's paternity. T.C., under the statute, is left with a legally presumed father who "has established his non-paternity by blood testing."

■ Our language in *Pierce* indicates that the three-year statute of limitations is absolute and bars an action even if the presumed father obtains knowledge of illegitimacy after the statute has run. *Id.* at 452. Permitting a challenge to the legitimacy of a child more than three years after its birth would defeat the clear statutory purpose of promoting legitimacy.[3] We hold that section 257.57, subd. 1(b) does achieve a valid governmental purpose and is thus constitutional as applied in this case.

### 2. *Minn.R.Civ.P. 60.02*

■ Clay also asserts on appeal that he is entitled to vacation of the paternity finding on the basis of Minn.R.Civ.P. 60.02(6) which provides:

On motion and upon such terms as are just, the court may relieve a party or his legal representative from a final judgment (other than a divorce decree), order, or proceeding and may order a new trial or grant such other relief as may be just for * * * any other reason justifying relief from the judgment.

In support of this argument, Clay cites *Wessels v. Swanson,* 289 N.W.2d 469 (Minn.1979), and argues that he is entitled to the requested relief because he has produced blood test results showing that he is not the biological father of T.C. In *Wessels,* the trial court had entered a default judgment determining that appellant there was the father of twin boys. On appeal the supreme court held that if blood tests were to furnish reliable evidence substantiating appellant's denial of paternity, the tests would furnish a reason justifying relief from the operation of the judgment pursuant to Minn.R.Civ.P. 60.02(6). *Id.* at 470.

In *Wessels,* however, there is no indication that paternity was determined in a dissolution proceeding or that the presumption of paternity that arises under Minn. Stat. § 257.55 when a child is born during a marriage was present. Therefore, the doctrine of collateral estoppel which arises from the presence of a dissolution decree and the statute of limitations bar arising from the operation of Minn.Stat. § 257.57, subd. 1(b) were not present in *Wessels.* They are present in this matter.

It is clear that *Wessels* was a paternity action in which it was incumbent upon those who alleged paternity to prove the parent/child relationship between the putative father and the child in question. Appellant cites no authority to support his request that, contrary to the express wording of Rule 60.02, the trial court grant relief from the operation of the dissolution decree. On the contrary, the supreme court has held:

[M]otions to modify divorce decrees brought under Rule 60.02 should not be entertained by the district courts. The

---

**3.** In a footnote even lengthier than this one, the dissent appears to argue that because Minn.Stat. § 257.57, subd. 1(b) allows appellant only three years in which to bring his action seeking a declaration of *non-paternity* while Minn.Stat. § 257.58 allows parties 19 years to bring an action seeking an adjudication of *paternity,* appellant's constitutional attack on section 257.57, subd. 1(b), if brought properly, would have merit. We cannot agree. Public policy is served when a party has 19 years to seek adjudication of parentage, which adjudication establishes a parent/child relationship with all its attendant legal and social benefits for the child. Conversely, that same public policy is served when a party must within three years after a child's birth bring an action to declare non-parentage, when parentage has been presumed by law because of a marriage or attempted marriage, and such declaration of non-parentage would deprive a child of legal and social benefits previously enjoyed.

district courts lack jurisdiction under Rule 60.02 to consider such motions. Only when facts are alleged that amount to fraud on the court * * * may a district court set aside a divorce decree. *Lindsey v. Lindsey,* 388 N.W.2d 713, 716 n. 1 (Minn.1986). *See also Bredemann v. Bredemann,* 253 Minn. 21, 24, 91 N.W.2d 84, 87 (1958) (divorce decrees are specifically omitted from the provisions of Rule 60.-02).

*Wessels* also differs from this case in that paternity in *Wessels* was determined in a default judgment and Wessels had made no appearance during the proceeding. Clay, however, had ample opportunity to litigate the question of paternity at the time of the dissolution. He stipulated to paternity. He testified to paternity at the hearing which was a default hearing only because the parties had stipulated to the resolution of all issues.

Further, to the extent that there may be any credibility to Clay's claims that he only recently learned that T.C. was not his child and that such awareness is newly discovered evidence, that claim would come within the provisions of 60.02(2).[4] Claims under 60.02(2) must be brought within one year after judgment. Of course, no claim was brought by Clay until long after one year was past.

Finally, the arguably broad discretion vested in the trial court to grant relief under 60.02(6) is not unlimited. When the relief requested falls within the provisions of 60.02(1), (2), or (3), the court may not grant that relief under (6). *Sommers v. Thomas,* 251 Minn. 461, 466–67, 88 N.W.2d 191, 195 (1958). Because all claims made by Clay fall within 60.02(2) or (3),[5] any relief under (6) would be improper.

### 3. *Fraud under 548.14*

■ Clay's final claim on appeal is that he is entitled to relief under Minn.Stat.

§ 548.14 (1984), which provides that a judgment obtained in a court of record by means of perjury or any fraudulent representation of the prevailing party may be set aside within three years after discovery of the perjury or fraud.

In denying appellant's requests for relief the trial court relied solely on Minn.Stat. § 257.57, subd. 1(b) and the fact that the three year statute of limitations set forth therein had run. We conclude that that reliance was appropriate, and that Minn. Stat. § 548.14 is inapplicable here.

Section 257.57, subd. 1(b), enacted in 1980, addresses only a specific proceeding, one initiated to declare the non-paternity of a man presumed to be the natural father of a child. It permits a child, the child's natural mother, or a man presumed to be the child's father to bring an action seeking a declaration of non-paternity "within a reasonable time after [obtaining] knowledge of relevant facts, *but in no event later than three years after the child's birth.*" (Emphasis added.) Section 548.14 permits an action to be brought "within three years after the discovery of * * * fraud." We note that in many, if not most of the proceedings initiated pursuant to section 257.-57, subd. 1(b), an element of misrepresentation or fraud will be present. Section 257.-57, subd. 1(b) has an unconditional three year statute of limitations; the statute of limitations in section 548.14 depends on the date of the discovery of the fraud. To the extent that an action seeking to declare non-paternity might be brought under either section 257.57, subd. 1(b) or section 548.14 there would be statutes of limitation of different length, and, therefore, the statutes would be in conflict.

Minn.Stat. § 645.26 provides in pertinent part as follows:

**Subdivision 1. Particular controls general.** When a general provision in a

---

**4.** Rule 60.02(2) provides that relief may be granted for:

> (2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial[.]

**5.** Rule 60.02(3) provides that relief may be granted for "fraud * * * misrepresentation, or other misconduct of an adverse party." Appellant's claim of fraud is discussed in connection with Minn.Stat. § 548.14, infra.

law is in conflict with a special provision in the same or another law, the two shall be construed, if possible, so that effect may be given to both. If the conflict between the two provisions be irreconcilable, the special provision shall prevail and shall be construed as an exception to the general provision, unless the general provision shall be enacted at a later session and it shall be the manifest intention of the legislature that such general provision shall prevail.

\* \* \* \* \* \*

**Subdivision 4. Laws passed at different sessions.** When the provisions of two or more laws passed at different sessions of the legislature are irreconcilable, the law latest in date of final enactment shall prevail.

We conclude that application of section 645.26 requires a determination that the legislature intended section 257.57, subd. 1(b), a special provision statute enacted some 90 years after a general provision statute (section 548.14) to be the preemptive sole method available to a party to raise the question of the non-paternity of one presumed to be the natural father of a child.

The dissent argues that section 548.14 does apply and must be utilized to fashion some relief for Clay.[6] The position espoused by the dissent would emasculate the three year statute of limitations set forth in section 257.57, subd. 1(b). One could bring an action to declare non-paternity at any time, 20, 30 or even 50 years after the birth of a child. Such action would be subject only to the section 548.14 requirement that it be brought within three years after discovery of the fraud involved in representation of fatherhood. While recognition of causes of action is seldom foreclosed by the observation that a deluge of litigation would result, clearly the strong

public policy interests in promoting legitimacy of children would be seriously undercut if attack on that legitimacy were available indefinitely.

The position of the dissent also contradicts the long established doctrine of finality of judgments which is embodied in the concepts of res judicata, collateral estoppel, and certainly in section 257.57, subd. 1(b). The clear public policy which seeks to promote the legitimacy of children must be recognized and respected. That recognition and respect is achieved by adherence to the provisions of section 257.57, subd. 1(b).

Finally, while we note that it is axiomatic in cases involving the welfare of a minor child, that the best interests of that child must be paramount, there is a sadly hollow ring in this factual setting to a declaration that T.C.'s "best interests" will be served. More realistically it is the "least detrimental alternative" that must be sought for him. Ultimately, the least detrimental alternative is to assure for T.C. whatever stability his continuing legitimacy may bring. That stability is best fostered by the determination that Minn.Stat. § 257.57, subd. 1(b) preempts all other means by which an action to declare non-paternity may be brought.

### III.

### *Indemnity or Contribution for Child Support*

■ Clay seeks indemnity or contribution from Augustin for T.C.'s support because T.C. allegedly is their common liability. Of course, no determination has been made that Augustin is the father of T.C. Augustin has, in fact, denied paternity in his Answer. He has not participated in any blood test to determine the probability that he is T.C.'s father. Ullrich testified that

---

**6.** The dissent also finds an issue of material fact as to what Clay knew about the parentage of T.C. and when he knew it. The trial court appears to have resolved that issue squarely against Clay, observing in a footnote to its February 18, 1986, order: "[P]laintiff claims he had no knowledge that he was not the natural father

of [T.C.]; however, a letter dated October 12, 1982 from Ronda Hanten, the Custody Investigator for Brown County in the dissolution action \* \* \* states in relevant part, ' \* \* \* Robert Clay is alleging that their youngest child is not his'."

Augustin is T.C.'s father, and Clay understandably wishes that the court would treat that claim as an established fact. However, without a finding that Augustin is T.C.'s father, consideration of Clay's claim for contribution would be inappropriate.

### IV.

*Attorney's fees*

 Augustin requested attorney's fees under Minn.Stat. § 549.21 (1984) which provides:

Upon motion of a party, the court, in its discretion may award to that party costs, disbursements, reasonable attorney fees and witness fees if the party or attorney against whom costs, disbursements, reasonable attorney and witness fees are charged acted in bad faith; asserted a claim or defense knowing it to be frivolous; asserted an unfounded position solely to delay the ordinary course of the proceedings or to harass; or committed a fraud upon the court. * * *

*Id.*

Augustin claims that Clay's efforts to modify the statute limiting non-paternity actions were in bad faith and that he misinterpreted *Pierce.* There is insufficient support in the record for Augustin's allegations. We believe that Clay had at least enough justification to his claim to avoid application of section 549.21 against him. The trial court did not err in denying Augustin's motion for such fees. We also deny his motion for fees on appeal.

### DECISION

The trial court did not err by refusing to vacate the portion of the judgment and decree of dissolution determining paternity and in denying appellant's request for blood tests.

The trial court did not err in awarding summary judgment to respondents under Minn.Stat. § 257.57, subd. 1(b), and *Pierce v. Pierce,* 374 N.W.2d 450. No relief is available to appellant under Minn.R.Civ.P. 60.02(6) and Minn.Stat. § 548.14.

Appellant was not entitled to indemnity or contribution for child support.

Respondent is not entitled to recover attorney's fees.

Affirmed.

RANDALL, J., concurs in part and dissents in part.

RANDALL, Judge, concurring in part, dissenting in part.

I concur in the holding of the majority that appellant is not entitled to indemnity or contribution for child support, and I agree that respondent is not entitled to recover attorney fees.

I respectfully dissent on the issue of the summary judgment granted to respondents under Minn.Stat. § 548.14 (1984). I would reverse and remand to the trial court with instructions to appoint a guardian ad litem for T.C., and allow appellant to develop with evidence and litigate on the merits, not of vacation of the dissolution judgment. Minn.Stat. § 548.14 (1984). I find that there is a genuine and material fact issue which is in dispute, namely whether or not there was a fraud upon the court by a prevailing party, and whether or not appellant had such knowledge of the fraud that he is estopped from now claiming it.

I would also instruct the guardian ad litem to consider the propriety of terminating appellant's parental rights. There is no present time limit bar to that action, and if appellant's parental rights to T.C. were terminated, T.C.'s mother and Blue Earth County would have the option of commencing paternity action under Minn.Stat. § 257.58 (1985) against anyone that they reasonably believed was the real father.

We have a fact situation where the statutory presumption of the paternity of a child born during wedlock must be set aside in the best interests of T.C. Paternity cases are normally clouded in smoke, suspicion, claims of sexual relations, and counter claims of infidelity with others. Here, for a change, we have an absolute, appellant is not the father of T.C.

Those engaged in the area of paternity law, including courts, doctors, and lawyers, agree on one thing. Although blood tests can never, with absolute medical certainty, determine who is the father, blood tests can, with absolute medical certainty, determine who is not. It is uncontroverted that an established medical center in this area, Memorial Blood Center of Minneapolis, conclusively established through their testing procedures that appellant Robert Clay is not the father of T.C. There is a letter in the file dated January 29, 1986, stating that. The signature is that of H.F. Polesky, M.D., Memorial Center's director, a respected physician practicing in this field. Over the past several years, Memorial Blood Center's tests have dragged many a putative father kicking and screaming to the altar of child support. Their medical expertise now ought to be available to untie the parent/child relationship between appellant and T.C. which rests not on reality, but on a piece of paper.

What we have in this case is the legal system handing five-year old T.C. a piece of paper which states that appellant is his father. T.C.'s mother knows that is not true. All the court personnel associated with the case know that is not true. The Blue Earth County Attorney's office knows that is not true. All friends and relatives who have knowledge of the facts know that is not true. The judiciary handing T.C. that piece of paper knows that is not true, and, in a few short years when T.C. can comprehend things, he will know that the court system gave him a piece of paper which is not true. This is hardly a situation to foster T.C.'s belief in the integrity of our legal system.

The majority acknowledges these concerns but states that it can find no legal vehicle to afford relief. The majority takes the position that Minn.Stat. § 548.14 is not available to appellant since Minn.Stat. § 257.57, subd. 1(b) is presumptive in an action to disestablish paternity, whether the claim is fraudulent or not.

Minn.Stat. § 548.14 states in pertinent part:

Any judgment obtained in a court of record by means of perjury, subornation of perjury, or any fraudulent act, practice, or representation of the prevailing party, may be set aside in an action brought for that purpose by the aggrieved party in the same judicial district within three years after the discovery by him of such perjury or fraud.

A fraud on the court exists:

[w]here a court is misled as to material circumstances, or its process if abused, resulting in the rendition of a judgment which would not have been given if the whole conduct of the case had been fair.

*Matter of Welfare of C.R.B.*, 384 N.W.2d 576, 579 (Minn.Ct.App.1986) (*pet. for rev. denied* (Minn. May 29, 1986) (quoting *Halloran v. Blue & White Liberty Cab Co.*, 253 Minn. 436, 442, 92 N.W.2d 794, 798 (1958).

On this set of facts, which strongly dictates a call for relief, I cannot interpret Minn.Stat. § 548.14 so literally as to preclude relief. If § 548.14 applies, appellant has time to reopen as he is easily within the three-year "after the discovery by him of such perjury or fraud." The discovery of the "material circumstances" was made only a few months ago in January 1986. Surely the trial court granting the original dissolution would not have rendered a judgment that appellant was T.C.'s father if the existence of the blood test results were known.

I find that summary judgment was inappropriate as there is a disputed material fact issue. The dispute centers around just how much appellant really knew prior to his dissolution that T.C. was not his child, and thus the issue existed as to whether he or Ullrich, or both, committed a fraudulent act or participated in a fraudulent representation. I would not preclude appellant just on the basis of a motion for summary judgment from attempting to show that there was a fraudulent representation and that he was an aggrieved party. Appellant never really did "know" until January 1986 that he was not the father of T.C. A father, any father, whether in wedlock or out of wedlock, can only "guess, suspect,

have a belief, or have a strong belief" that he is not the father of a given child. A father never "knows" that he is not the father of a given child unless competent blood tests are done. Although appellant may well have suspected prior to the dissolution that he may not have been T.C.'s father, it should not be held against him that he sat on those suspicions until he was positive. The issue of just what did appellant know prior to the dissolution of a marriage is in dispute. The record discloses that appellant may have believed or suspected that he was the father, but appellant contends that he did not conclusively know until after the blood tests. Whether or not appellant's knowledge precluded him from utilizing Minn.Stat. § 518.14 should not have been tried in a motion for summary judgment.

The position of respondent Blue Earth County is that all that needs to be said and done has been said and done, and that all summary judgments against appellant should be affirmed. Blue Earth County's involvement in this case is monetary, and does not accord with T.C.'s best interests. Blue Earth County knows that appellant is not T.C.'s father. Blue Earth County knows that T.C.'s mother may have some evidence as to who is. Blue Earth County is simply here arguing for affirmance because, having advanced welfare payments to T.C.'s mother and having gained a judgment against appellant, it wishes to collect back support monies from him even though it has proof he is not really T.C.'s father. Its arguments for affirmance are based on *res judicata* and the statute of limitations. Its position is legal, but hardly a base from which to construct a marble monument to equity.

I note in the file a June 18, 1985, trial court order stating "that in order to protect the rights of the minor child, T.C., a guardian ad litem be appointed to represent said child in any further proceedings." Whoever was responsible for that appointment never followed through. Appellant, on December 23, 1985, again moved the court for an appointment of a guardian ad litem for T.C. to represent his interests during fur-

ther pendency of the action. The court denied that motion on February 28, 1986. With the disputed fact issue as to what point in time appellant knew for sure that he was not T.C.'s father, it was even more paramount that T.C.'s interests be protected by a guardian ad litem. The denial of that appointment when it is such an important fact issue in dispute constitutes sufficient grounds for a remand, an apointment of a guardian ad litem, and a hearing on the merits.

It is clear that none of the listed parties genuinely have T.C.'s best interests in mind. Appellant seeks to get out of fatherhood, has begrudgingly paid minimal support, and has exhibited absolutely no desire to assist in the nuturing and raising of T.C. as his adoptive or foster parent. Respondent Augustin's interests are certainly adversarial. Blue Earth County's interest is monetary. T.C.'s mother has, up until now, not gone to court to establish paternity of the person she believes may be the father, but has been content to allow Blue Earth County to pursue support payments from appellant.

While the issue of termination of appellant's parental rights is not before us, and thus cannot be decided by this opinion, the record supports the determination that a guardian ad litem should explore this avenue in T.C.'s best interests. A guardian ad litem is an absolute must in this case to represent T.C.'s rights. The child's paramount interest and right to a proper child/parent relationship cannot be downplayed. Fewer state protected interests are more compelling.

I easily envision in T.C.'s future confusion, tears, and embarrassment from having, in one hand, a piece of paper from the courts which says that appellant is his father, and having in his other hand a piece of paper from a respected medical center which positively establishes that appellant is not.

A properly appointed guardian ad litem for T.C. could explore termination of appellant's parental rights. That would leave open to T.C.'s mother and Blue Earth County under Minn.Stat. § 257.58 the

right, if they truly are concerned for T.C.'s best interests, to pursue a paternity action against any person that the evidence so warrants.

Should T.C.'s mother and Blue Earth County elect not to pursue a paternity action, it may never be that Minnesota courts can tell T.C. who his real father is. But then we ought not to be in the business of solemnly telling T.C. that his father is someone that we know for certain is not.

I would reverse and remand to the trial court with instructions that appellant has brought to the court's attention, within three years of discovery, sufficient facts to justify reopening the dissolution decree under Minn.Stat. § 548.14. I do not find, as the majority does, that Minn.Stat. § 257.57 preempts a trial court from finding a fraud upon the court if the action under § 548.14 is timely (started within three years after the discovery of the fraud), although not necessarily timely under § 257.57 (action must be brought within three years of child's birth).

The majority basis part of its reasoning on the general statement that there is a clear public policy [1] promoting the legitimacy of children, and the majority then reasons from that general premise that on these facts the least detrimental alternative is to assure for T.C. "whatever stability his continuing legitimacy may bring." I respectfully disagree. There is no stability in

T.C.'s parentage now, as the world knows his paper father is not his real father, his mother has told many whom she suspects is his real father, and his mother and Blue Earth County have done nothing about that. I also find no "continuing legitimacy" for T.C. since there is nothing legitimate about calling something black that is concededly white, or stating that grass is blue when it is concededly green.

I would direct the trial court to reopen this case for a hearing on the merits, appoint a guardian ad litem for T.C. so that the child, who should be the real focus of this case, is properly protected, and I would direct that termination of appellant's parental rights, together with any other legal avenues designed to further T.C.'s best interests, be explored.

I appreciate the majority opinion that a finality to court actions is desirable. I normally agree with that. This is not a normal case. Logic and common sense lend themselves to a decision to send this matter back to the trial court one more time. Concededly, another walk, however short, through the red tape and fine print of paternity laws may be painful to T.C. and his mother, but it cannot be as painful to him as our doing nothing.

1. I do not find that what the majority calls "a clear public policy", i.e. the statutes addressing legitimacy, are all that clear. For instance, under Minn.Stat. § 257.57, subd. 1(a), there is never a statute of limitations on bringing an action to declare the existence of a father and child relationship under certain conditions. Under Minn.Stat. § 257.57, subd. 2, there is never a statute of limitations on an action to determine the existence or nonexistence of a father and child relationship if certain conditions exist. Under Minn.Stat. § 257.58, the determination of a father and child relationship can be brought up until the child is 19 (one year after reaching majority), depending on the circumstances. Under Minn.Stat. § 257.57, subd. 1(b), on which the majority relies, actions are limited to within three years of the child's birth. All of the statutes and subdivisions I have just recited refer to the existence or nonexistence of the father/child relationship. Yet, depending on

such varied and subjective circumstances as whether or not the child's mother is on welfare, whether or not the alleged father and mother attempted a marriage that was later declared void or invalid, whether or not the man's name appears on the birth certificate, or whether or not the father openly holds out a minor child as his child and takes him into his home, the statute of limitations may run from a low of three years to a high of forever.

If the establishment of parentage is important, then the disestablishment of parentage, when it is an accepted fact as here, is equally important for they speak to the same thing.

I also concur with the majority that appellant did not timely and properly raise the constitutional issue of lack of due process as it applied to him, i.e. just a short time of three years for him to disestablish parentage, but up to nineteen years or a lifetime for others to establish his parentage, but the issue is there.